HARBORLITE CORPORATION,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Southern Pacific Transportation
Co., Intervenor.

No. 78–1443.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 27, 1979.

Decided Dec. 13, 1979.

As Amended Dec. 15, 1979.

Daniel J. Sweeney, Washington, D. C., with whom John M. Cutler, Jr., Washington, D. C., was on brief, for petitioner.

David Papowski, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Christine N. Kohl, Deputy Associate Gen. Counsel, Washington, D. C., at the time the brief was filed, and Robert D. Jones, Atty., I. C. C., Washington, D. C., were on brief, for respondents.

John MacDonald Smith, San Francisco, Cal., a member of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, with whom James H. Pipkin, Jr., Washington, D. C., was on brief, for intervenor.

John J. Powers, III and Andrea Limmer, Attys., U. S. Dept. of Justice, Washington, D. C., also entered appearances for respondent United States of America.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and TAMM, Circuit Judge.

TAMM, Circuit Judge:

In this case, we review a decision of the Interstate Commerce Commission dismissing a complaint that alleged unlawful rate discrimination in violation of section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 10741(b) (West Spec.Pamph. 1979). Because the Commission has not articulated a reasoned basis for its decision and has not adequately addressed the evidence and arguments presented by the complainant, we remand for further proceedings.

## I. THE FACTUAL BACKGROUND

Harborlite Corporation is a small, family-owned company that mines perlite rock, a volcanic substance with various industrial uses, for shipment from its mine in Superior, Arizona, to eastern processing facilities. Harborlite's three major competitors, United States Gypsum Company, General Refractories Corporation, and Johns-Manville Corporation, also have perlite mines in the West,[1] but their mines are 300–400 miles closer to the East than is Harborlite's mine at Superior. These three competitors dominate the market for perlite, supplying the East with approximately 250,000 tons annually. Harborlite's annual shipments, on the other hand, have been limited to about 5000 tons, some two percent of the amount shipped by its competitors.

Freight charges constitute the primary component in the price of perlite rock for eastern buyers. Because the cost of other types of transportation is prohibitively high, shipment is invariably by rail. Even by rail, however, the cost of shipment substantially exceeds the preshipment selling price of crude perlite.

Having suffered net losses for six of the last eight years, Harborlite, on October 5, 1976, filed a complaint with the ICC against over 400 railroad defendants. It blamed its intolerable economic position on an alleged railroad rate disparity of some twenty-five percent, distance considered, between the rates charged to Harborlite and those charged to its competitors. The company contended that this rate disparity constituted "undue or unreasonable" rate discrimination in violation of section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 10741(b) (West Spec.Pamph.1979),[2] and sought financial reparations and newly designated rates. Harborlite's three major competitors intervened in the proceeding before the ICC, taking the side of the railroad defendants.

---

1. Perlite is found domestically only in the western United States.

2. Harborlite also alleged that the rates it was charged were unreasonable, in violation of § 1(5) of the Interstate Commerce Act, 49 U.S. C.A. § 10701 (West Spec.Pamph.1979). The Commission found that the rates were reasonable, however, and Harborlite did not attack this finding in its petition to this court. Brief for Petitioner at 4–5.

The Commission, operating under its "modified procedure," see 49 C.F.R. §§ 1100.43–.52 (1978), considered the case solely on the basis of affidavits and written arguments submitted by the parties. On August 30, 1977, Review Board No. 4, with Board Member Shaw dissenting on the section 3(1) question, issued a report and order dismissing Harborlite's complaint. Harborlite appealed this ruling without success to Division 1 of the ICC. In its decision and order of March 20, 1978, the Division briefly stated its own reasons for dismissing Harborlite's complaint, but also adopted the findings and conclusions of the Review Board. Harborlite then sought review by the entire Commission, but this was summarily denied on April 28, 1978. Having exhausted its administrative remedies, Harborlite petitioned this court for a review of the ICC's actions.[3]

## II. THE APPLICABLE SUBSTANTIVE LAW

As the Supreme Court has noted, "[t]he principal evil at which the Interstate Commerce Act was aimed was discrimination in its various manifestations," *New York v. United States*, 331 U.S. 284, 296, 67 S.Ct. 1207, 1213, 91 L.Ed. 1492 (1947), "and language of the broadest scope has been used to accomplish [this purpose]," *United States v. Baltimore & Ohio Railroad*, 333 U.S. 169, 175, 68 S.Ct. 494, 497, 92 L.Ed. 618 (1948). Section 3(1) of the Act embodies this strong congressional policy:

It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.

49 U.S.C. § 3(1) (1976) (current version at 49 U.S.C.A. § 10741 (West Spec.Pamph.1979)).[4] Because of the legislative concern about discrimination as such, a rate "may be perfectly reasonable . . . and yet may create an unjust discrimination or an unreasonable preference [in violation of the Act]." *ICC v. Baltimore & Ohio Railroad*, 145 U.S. 263, 277, 12 S.Ct. 844, 848, 36 L.Ed. 699 (1892).

■ The law under section 3(1) is relatively well established, and the parties agree on the basic nature of an action under this section for relief from discriminatory rates. In the leading case of *Chicago & Eastern Illinois Railroad v. United States*, 384 F.Supp. 298 (N.D.Ill.1974) (three-judge court) (per curiam), *aff'd mem.* 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), the court stated the four elements of a section 3(1) action and the burden of proof on these elements:

To support a finding of a violation of section 3(1), it must be shown (1) that there is a disparity in rates, (2) that the complaining party is competitively injured, actually or potentially, (3) that the carriers are the common source of both the allegedly prejudicial and preferential

---

3. Our jurisdiction exists under 28 U.S.C. § 2342(5) (1976).

4. In 1978, Congress recodified and simplified the language of the Interstate Commerce Act, and the contents of § 3(1) are now found in § 10741 of title 49. *See* Act of Oct. 17, 1978, Pub.L.No.95–473, 92 Stat. 1337. The recodified § 3(1) now reads in part as follows: "A common carrier providing transportation or service subject to the jurisdiction of the Commission under chapter 105 of this title may not subject a person, place, port, or type of traffic to unreasonable discrimination." 49 U.S.C.A. § 10741(b) (West Spec.Pamph.1979). The 1978 legislation did not make any substantive change in the law. Act of Oct. 17, 1978, Pub.L. No.95–473, § 3, 92 Stat. 1337.

treatment, and (4) that the disparity in rates is not justified by transportation conditions. The complaining party has the burden of proving the presence of the first three factors and the carriers have the burden of justifying the disparity, if possible, in connection with the fourth factor.

384 F.Supp. at 300–01. *Accord, New York v. United States*, 568 F.2d 887, 898 (2d Cir. 1977); *A. Lindberg & Sons, Inc. v. United States*, 408 F.Supp. 1032, 1037 (W.D.Mich. 1976) (three-judge court); *Baltimore & Ohio Railroad v. United States*, 391 F.Supp. 249, 259 (E.D.Pa.1975) (three-judge court).

## III. THE REQUIREMENT OF FINDINGS AND REASONS

■ In a section 3(1) controversy, the Commission adjudicates a legal dispute in a manner similar to that of a court of law. *See ICC v. Louisville & Nashville Railroad*, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913), *discussed in United States v. Florida East Coast Railway*, 410 U.S. 224, 244–45, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).[5] The paramount strength of administrative adjudication is its efficient processing of massive amounts of complex and specialized litigation. Because of the need to protect this efficiency, administrative adjudicators cannot invariably be held to the procedural safeguards applicable in *judicial* adjudication. Nonetheless, administrative agencies must adhere to certain safeguards to ensure that litigants have the equivalent of their "day in court," even though the tribunal is an administrative agency.[6]

■ One basic procedural safeguard requires the administrative adjudicator, by written opinion, to state findings of fact and reasons that support its decision. These findings and reasons must be sufficient to reflect a considered response to the evidence and contentions of the losing party[7] and to allow for a thoughtful judicial review if one is sought. *See Secretary of Agriculture v. United States*, 347 U.S. 645, 652–54, 74 S.Ct. 826, 98 L.Ed. 1015 (1954). The requirement of findings and reasons in a section 3(1) proceeding is well established. *See, e. g., ASG Industries, Inc. v. United States*, 548 F.2d 147, 154–55 (6th Cir. 1977); *Atchison, Topeka & Santa Fe Railway v. United States*, 218 F.Supp. 359, 363–66 (N.D.Ill.1963) (three-judge court); *Stanislaus County v. United States*, 193 F.Supp. 145, 147 (N.D.Cal.1960) (three-judge court) (per curiam).

Perhaps the most essential purpose served by the requirement of an articulated decision is the facilitation of judicial review. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Moreover, a court "cannot 'accept appellate counsel's *post hoc* rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *FPC v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).[8] Because the administrative action must

> be tested by the basis upon which it purports to rest, that basis must be set forth

---

**5.** "While the line dividing them may not always be a bright one, [there is] a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

**6.** *Cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (Douglas, J., concurring) ("It is procedure that spells much of the differ-

ence between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.").

**7.** "[A] disappointed party, whether he plans further proceedings or not, deserves to have the satisfaction of knowing why he lost his case." 2 K. Davis, Administrative Law Treatise § 16.05, at 448 (1958).

**8.** A "court is powerless to affirm . . . administrative action by substituting what it considers to be a more adequate or proper basis.

with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).[9]

■■■ The degree of precision required in an agency's findings and reasons is directly related to the level of judicial scrutiny to which the agency decision is subject. As in most administrative adjudications, our scope of review in the present case is to determine whether the agency's decision is supported by substantial evidence on factual matters[10] and by a rational basis concerning questions of law and the application of law to fact. *See, e. g., ASG Industries, Inc. v. United States*, 548 F.2d 147, 151 (6th Cir. 1977); *City of Galveston v. United*

*States*, 257 F.Supp. 243, 245–46 (S.D.Tex. 1966) (three-judge court), *aff'd mem.* 386 U.S. 269, 87 S.Ct. 1018, 18 L.Ed.2d 38 (1967). The requirement of findings and reasons commands the Commission to articulate its decision with sufficient clarity to allow us to decide whether these standards have been met.[11]

## IV. THE COMMISSION'S TREATMENT OF THE SUBSTANTIVE ISSUES

As we have noted, the criteria enunciated in *Chicago & Eastern Illinois Railroad v. United States*, 384 F.Supp. at 300–01, govern in this case. The ICC and the defendant railroads contend that the Commission's decision properly follows these criteria. Harborlite, on the other hand, asserts that the Board and the Division opinions[12] "are studies in confusion." Brief for Petitioner at 6. In essence, Harborlite contends that the Commission's opinions indicate a misun-

To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

9. "The proper focus of a reviewing court is on the reasons given by the [agency] and not on reasons that may come to light if and when a court rummages throughout the record in an effort to reconstruct on what basis the [agency] might have decided the matter." *United States ex rel. Checkman v. Laird*, 469 F.2d 773, 783 (2d Cir. 1972) (Leventhal, J., sitting by designation).

10. "Substantial evidence" is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)), that is, " 'enough to justify, if the trial were to a jury, a refusal to direct a verdict,' " *Illinois Cent. R. R. v. Norfolk & W. Ry.*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

11. A related consideration in defining the requisite degree of precision in an agency's findings and reasons is the nature of the issues that it must confront. To the extent that the agency is entrusted with the resolution of "legislative" and policy questions, it has considerable discretion and need not respond in detail to particu-

larized evidence and arguments. On the other hand, to the extent that "adjudicative" questions are presented, the agency must more closely address the specific factual and legal issues that are raised. *Compare* 5 U.S.C. § 553(c) (1976) (requiring only "a concise general statement of . . . basis and purpose" for agency rules adopted under the "notice and comment" procedure set forth in § 553) *with id.* § 557(c) (requiring "findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented on the record" in cases of formal adjudication governed by this section); *cf. National Welfare Rights Organization v. Mathews*, 174 U.S.App. D.C. 410, 421–22, 533 F.2d 637, 648–49 (D.C. Cir. 1976) (§ 553's requirement of "a concise general statement of . . . basis and purpose" takes on added meaning when rulemaking depends on the resolution of specific factual questions). Here, we deal with a classic case of agency adjudication, a case that involves decisionmaking concerning specific persons, based on a determination of particular facts and the application of general principles to those facts. In this context, we expect the parties to present specific evidence and closely reasoned arguments, and we demand that the decisionmaker's opinion indicate an appropriate consideration of the evidence and arguments presented.

12. The initial Board report and the subsequent Division opinion must be considered together because the Division adopted the findings and conclusions of the Board. *See Harborlite Corp. v. Southern Pac. Transp. Co.*, No. 36457, at 2

derstanding of the applicable law and reflect factual findings that are not supported by substantial evidence.

The ICC's treatment of the section 3(1) controversy in this case, if nothing else, is laconic. The Review Board disposed of the matter in a single paragraph,[13] and the Division, in addition to affirming and adopting the report of the Board, devoted but five sentences to the section 3(1) question.[14] Regretfully, our function on review precludes the brevity that the Commission found so enticing: we must consider the case within the four-element, two-step analysis called for by *Chicago & Eastern Illinois Railroad* to determine the adequacy of the Commission's treatment of the relevant issues before it.[15]

## A. Disparity

 The first element that the complaining party must prove in a section 3(1)

Length, as such, of course, is not a relevant factor concerning the requirement of findings and reasons. We do note the Commission's brevity, however, to put in context our discussion of its treatment of the substantive issues that it was required to consider.

---

(ICC Div. 1, served Mar. 20, 1978) [hereinafter cited as Division Opinion], *reprinted in* Joint Appendix (J.A.) at 384, 385.

13. That paragraph reads in its entirety as follows:

Complainant has offered evidence showing that (1) it has made eastbound shipments from Superior to Vicksburg in relatively constant movements, (2) it is operating at a net loss, (3) it ships only a small amount of the total crude perlite going from west to east, and (4) it has lost certain sales. Defendants and interveners, on the other hand, have offered evidence showing that the amount of crude perlite shipped to a destination is determined by the market for processed, expanded perlite at that destination. The record also shows that materials competitive with crude perlite have a significant effect on its demand. Thus, it is uncertain as to what effect rail rates are having on the movement of crude perlite from Superior. Complainant has the burden of proof, and it has not shown whether it is rail rates and not other factors that affect the movement of crude perlite to Vicksburg and other eastern destinations. The lost sales may have been due to higher rates from Superior, but Superior has a distance and distinct geographical disadvantage. Contrary to complainant's position we find that Docket No. 28300 is not a proper standard to measure the rates from Superior. As noted, the Commission specifically declined to prescribe that scale on transcontinental traffic. Superior is, according to the record, 415 miles from El Paso and it is to the west of the Rockies. By any recognized standard, it is a true transcontinental origin on this traffic. Even if we were to use percentages of first class based on Docket No. 30660 from Superior and Docket No. 28300 from the other origins, we cannot conclude that an undue disparity in the rates is shown on this record. *Harborlite Corp. v. Southern Pac. Transp. Co.*, No. 36457, at 14–15 (ICC Review Bd. No. 4, served Aug. 30, 1977) [hereinafter cited as Review Board Opinion], *reprinted in* J.A. at 364, 377–78.

14. These five sentences read in their entirety as follows:

With regard to the section 3(1) issue, we find a disparity in rates exists but that it is not shown to be undue because of differences in location of these origins and differences in distance from Superior to the eastern destinations. Although the rates from Superior are higher to eastern destinations than those from the competitive points of Grants, Antonito and Socorro, the distances from Superior are also substantially longer. Furthermore, any rate disparity between Harborlite and its competitors on movements of equal distance is justified because of the substantial dissimilarity in transportation and operating conditions. Not only are the movements over different rail lines and different routes, but the hazards of transportation on the movements vary. Additionally, there is no carrier or group of carriers which is the common source of the rate prejudice and which effectively participates in both the prejudiced traffic and the preferred traffic.

Division Opinion at 2, *reprinted in* J.A. at 385.

15. At no point did either the Review Board or the Division clearly delimit this four-element, two-step analysis. On the other hand, Board Member Shaw, who dissented from the Board's § 3(1) decision, did set forth the correct framework under which a § 3(1) claim must be tested:

To support a finding of a violation of section 3(1) of the act, it must be shown by complainant that there is a disparity in rates maintained by a common group of carriers which is working a competitive injury on complainant. Defendants then have the opportunity of demonstrating that these circumstances are warranted by transportation conditions.

Review Board Opinion at 16 (Shaw, Board Member, dissenting in part), *reprinted in* J.A. at 379.

action is a disparity in rates. *Chicago & Eastern Illinois Railroad v. United States,* 384 F.Supp. at 300. A mere difference in the rates charged to the complainant, when compared to those charged to its allegedly preferred competitors, does not alone amount to a "disparity" under section 3(1), for shipping distance and fixed terminal costs must also be considered.[16] The ICC's rate schedules typically reflect these twin considerations of distance and terminal costs. *See, e. g., Board of Trade v. Illinois Central Railroad,* 344 I.C.C. 818, 833 (1973) ("The docket No. 28300 scale primarily reflects distance, but it gives proportionate effect to terminal expenses, so that the scale progresses at a slower rate as distance increases; in other words, the rate per mile is higher for shorter distances."), *aff'd sub. nom. Chicago & Eastern Illinois Railroad v. United States,* 384 F.Supp. 298 (1974), *aff'd mem.* 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). Although the Commission in its brief argues that "myriad [other] factors[, including] volume, frequency of shipment, market conditions, competitive forces, operating conditions, availability of return traffic, etc.," are properly considered in determining whether a disparity exists, Brief for Respondent at 10, those factors are appropriately addressed in connection with the other elements of a section 3(1) action. To establish the threshold element of disparity, a complainant need only show that, after an adjustment is made for the effect of terminal expenses,[17] a difference in *per-mile* rates still remains. *See Prince Albert Pulp Co. v. Canadian National Railways,* 349 I.C.C. 482, 491 (1974); *Board of Trade v. Illinois Central Railroad,* 344 I.C.C. at 832–33.[18]

In the present case, Harborlite presented uncontradicted evidence that the rates it was charged from Superior to eastern destinations were, distance and terminal costs considered, over twenty-five percent higher than the rates paid by its competitors for their eastbound shipments. Joint Appendix (J.A.) at 40–41, 52–58 (statement of Carl J. Lessing).[19] This rather dramatic evidence would seem to compel a finding of disparity. To the contrary, however, the Review Board did not directly make a finding on

16. In a § 3(1) case, the distance that the complainant ships its goods is invariably different from the corresponding distance for its competitors. Unless the length of shipment is considered, a difference in rates is to be expected and is meaningless for § 3(1) purposes. In addition, due to the fixed terminal costs that are common to all shipments, it is recognized that as the length of a shipment increases, the rate charged per mile should ordinarily decrease as the terminal costs are apportioned over more miles of shipment.

17. Of course, if the rates compared are for shipments of similar distances, the terminal-cost variable, along with the distance variable, ordinarily drops out, and a difference in rates is itself tantamount to a disparity.

18. The ICC has often used the "Docket No. 28300" first-class scale, *see* Class Rate Investigation, 1939, 286 I.C.C. 171 (1952), as a "yardstick" in § 3(1) actions, deciding the disparity issue by comparing the allegedly preferred to the allegedly prejudiced rates through the use of ratios based on the rates in this scale. *See, e. g., Investigation of R. R., Freight Rate Structure,* 345 I.C.C. 1364, 1417–18 (1976) ("a line of recent decisions by this Commission has held that the docket No. 28300 first-class rates are an acceptable standard with which to determine the existence of rate disparities"); *Board of Trade v. Illinois Cent. R. R.,* 344 I.C.C. 818, 832–33 (1973), *aff'd sub nom. Chicago & E. Ill. R. R. v. United States,* 384 F.Supp. 298 (N.D.Ill. 1974), *aff'd mem.* 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). As noted in *Board of Trade,* this scale reflects distance and terminal costs, factors that must be considered before a finding of disparity can be made.

Although a difference in rates, after mileage and terminal costs have been considered, generally constitutes a disparity under § 3(1), it is possible that the Commission, in a reasoned opinion, could justify "other yardsticks [as] . . . more appropriate in particular situations." *Board of Trade v. Illinois Cent. R. R.,* 344 I.C.C. at 833. *See also Meat & PHP, TOFC, SWL, WTL, Official Territories,* 344 I.C.C. 299, 316 (1973).

19. For example, Harborlite's rate of $31.13 per ton for a 1914-mile shipment was contrasted with rates for its competitors that averaged $24.70 for an average shipping distance of 1961 miles. *See* J.A. at 41 (statement of Carl J. Lessing).

the issue,[20] and the Division made only the following enigmatic comments:

> With regard to the section 3(1) issue, we find a disparity in rates exists but that it is not shown to be undue because of differences in location of these origins and differences in distance from Superior to the eastern destinations. Although the rates from Superior are higher to eastern destinations than those from the competitive points . . . , the distances from Superior are also substantially longer.

*Harborlite Corp. v. Southern Pacific Transportation Co.*, No. 36457, at 2 (ICC Div. 1, served Mar. 20, 1978) [hereinafter cited as Division Opinion], *reprinted in* J.A. at 384, 385.

[11] This statement is puzzling to say the least. It first seems to indicate a finding of disparity, but then states that at least there is no "undue" disparity because of a difference in the mileage of the shipments. A mere difference in mileage, however, is irrelevant. A disparity, by definition, involves a difference in rates, *distance and terminal costs considered.* Furthermore, the Division's statement suggests that it may well have placed on the complainant a burden to prove, at the disparity

stage of the section 3(1) analysis, not only that a disparity exists but that the disparity constitutes "undue" discrimination. This is simply not the law. *See Chicago & Eastern Illinois Railroad v. United States*, 384 F.Supp. at 300–01.[21]

The Commission opinions reflect a probable misconception of the nature of a disparity. Harborlite has presented strong evidence on this initial element,[22] and a rejection of its section 3(1) claim for lack of proof of disparity would require a much more coherent set of findings and reasons than those before us now.

### B. Competitive Injury

As the second element in a section 3(1) action, the complainant must prove that the disparity in rates is the source of a competitive injury, actual or potential. *Chicago & Eastern Illinois Railroad v. United States*, 384 F.Supp. at 300; *National Association of Recycling Industries v. ICC*, 190 U.S.App. D.C. 118, 134 n.80, 585 F.2d 522, 538 n.80 (D.C.Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979). In *Atchison, Topeka & Santa Fe Railway v. United States*, 218 F.Supp. 359 (N.D.Ill.1963) (three-judge court), in an extended discussion of this issue, *see id.* at 369–73, the court

---

**20.** The Board stated that it could not "conclude that an undue disparity in the rates is shown on this record." Review Board Opinion at 14–15, *reprinted in* J.A. at 377–78. This indicates a possible confusion, similar to that discussed in the text with reference to the Division, on the nature of the proof required of the complainant at the "disparity" stage of the § 3(1) analysis. *See also* note 21 *infra*.

The Board also noted that Superior is located well into the "Docket No. 30660" territory, *see Class Rates, Mountain-Pacific Territory*, 296 I.C.C. 555 (1955), whereas its competitors' originating points are located in or close to the "Docket No. 28300" territory, *see Class Rate Investigation*, 1939, 286 I.C.C. 171 (1952), which extends east from the Rocky Mountains. Review Board Opinion at 13, *reprinted in* J.A. at 376. On this basis, the Board rejected the use of "Docket No. 28300" rates as a "yardstick" for comparing the rates of Harborlite with those of its competitors. *Id.* at 14, *reprinted in* J.A. at 377. *See also* note 18 *supra*. The Board did not, however, indicate what alternative "yardstick" it would use to decide the disparity issue, nor did it make a finding on

disparity as such, *i. e.*, without regard to whether any disparity was "undue."

**21.** If, by saying that the disparity was "not shown to be undue," the Division meant that the disparity was somehow de minimis, it is difficult to imagine how that conclusion was reached on this record. *Cf. New York Cent. R. R. v. United States*, 207 F.Supp. 483, 490 (S.D. N.Y.1962) (three-judge court) (Friendly, J.) ("the Commission has never adopted a doctrinaire position that any failure to bring rail charges into exact accord with differences in distance is a preference or prejudice, much less an undue one").

**22.** The dissenting member of the Review Board, finding a disparity to be present, concluded: "Whether viewed from the percentage of the docket No. 28300 first-class rates, earnings per ton-mile or car-mile, or the relationship between revenues and variable costs, Harborlite pays higher rates, distance considered, than its competitors." Review Board Opinion at 15 (Shaw, Board Member, dissenting in part), *reprinted in* J.A. at 378.

posed the question of whether injury is "established by proof of the existence of intensive competition and small profit margins in an industry highly dependent upon transportation of its product to distant markets," *id.* at 370, and answered that question in the affirmative, *id.* at 372.[23]

In the present case, Harborlite presented evidence that it was competing for the eastern market with the three allegedly preferred competitors; that freight rates are a paramount consideration in the marketing of perlite in the East, accounting for substantially more than half of the delivered price of the unprocessed product;[24] that it had been precluded from making sales in the East because of its higher per-mile rates; that its mine at Superior was being confined to production at less than twenty-five percent of capacity due to a lack of sales; that it could promptly double its sales with per-mile rates equivalent to its competitors'; that it had suffered net losses on its operations in six of the last eight years; that it shipped east a bare two percent of the approximately 250,000 tons shipped annually by its three competitors; and that the small volume that it did ship east had dwindled by some thirty percent over the last two-year period. J.A. at 23, 26, 32–34, 291–93 (statements of William G. Blunt). The defendant railroads and the intervening competitors of Harborlite conceded the existence of the asserted competition and the critical importance of freight charges in marketing the commodity. *Id.* at 175–77 (statement of Walter G. Gray); *id.* at 212, 214 (statement of Ellwood H. Spencer); *id.* at 256, 262 (statement of Edward Maki). In its brief, Harborlite described the situation this way: "Here is a picture of a victim which is not only bleeding, but expiring." Reply Brief for Petitioner at 5. Before the Commission, it had called its injury "complete and utter," J.A. at 356 (reply argument of Harborlite Corp.), "clearly perceivable and truly classic," *id.* at 359.

Although we do not necessarily subscribe to Harborlite's colorful descriptions of its proof of injury, we do note that the evidence here was in such a one-sided state that Harborlite was entitled to a finding of injury in the absence of persuasive and well-grounded reasoning by the ICC to the contrary. Instead of a favorable resolution of the issue or a well-reasoned adverse conclusion, however, Harborlite received only the following ambiguous and vague remarks from the Review Board, adopted without further comment by the Division:

> Defendants and interveners . . . have offered evidence showing that the amount of crude perlite shipped to a destination is determined by the market for processed, expanded perlite at that destination. The record also shows that materials competitive with crude perlite have a significant effect on its demand. Thus, it is uncertain as to what effect rail rates are having on the movement of crude perlite from Superior. Complainant has the burden of proof, and it has not shown whether it is rail rates and not other factors that affect the movement of crude perlite to Vicksburg and other eastern destinations. The lost sales may have been due to higher rates from Superior, but Superior has a distance and distinct geographical disadvantage.

*Harborlite Corp. v. Southern Pacific Transportation Co.*, No. 36457, at 14 (ICC Review Bd. No. 4, served Aug. 30, 1977) [hereinafter cited as Review Board Opinion], *reprinted in* J.A. at 364, 377.

As on the element of disparity, the Commission apparently labored under a misap-

---

**23.** This court has read the case law as "suggesting that *any* showing of (a) actual competition between the parties subject to the rate disparity, and of (b) some effect on that competitive situation caused by the disparity, will suffice" to establish the element of injury. *Farmers Union Cent. Exch. v. FERC*, 189 U.S. App.D.C. 250, 264 n.36, 584 F.2d 408, 422 n.36 (D.C.Cir.) (emphasis in original), *cert. denied*, 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978).

**24.** For example, the railroads charged $31.13 to ship a ton of crude perlite with a preshipment price of $11.50 from Superior to Vicksburg, Michigan. J.A. at 26 (statement of William G. Blunt).

prehension of the proof required to establish injury. The mere existence of other products competing with perlite does not negate the existence of Harborlite's injury vis-à-vis the three successful perlite marketers, who apparently have managed to compete quite well with the alternative products. Furthermore, the Board's statement that the effect of freight rates was "uncertain," even if accurate, is immaterial, for injury need not be proved to the point of certainty. In sum, we question whether a finding against Harborlite concerning injury could be sustained on this record,[25] but in any event, it is clear that the Commission has not adequately responded to the forceful evidence presented.

## C. Common Source of Prejudicial and Preferential Rates

As the third and final element in its prima facie case, the complainant must show that the carriers against whom it seeks relief are the common source of both the preferential and the prejudicial rates. *Chicago & Eastern Illinois Railroad v. United States*, 384 F.Supp. at 300. "A carrier or group of carriers must be the common source of the discrimination—must effectively participate in both rates, if an order for correction of the disparity is to run against it or them." *Texas & Pacific Railway v. United States*, 289 U.S. 627, 650, 53 S.Ct. 768, 776, 77 L.Ed. 1410 (1933). This requirement exists because

> preference or prejudice can be found only by a comparison of two rates. If these are the rate of one carrier to point A and that of another to point B while a relationship of one to the other may be determined neither the first nor the second carrier alone can be held to have created

the relation. Assuming that neither rate is unreasonable, the one carrier cannot be compelled to alter its rate, because the other's is higher or lower for the same service.

*Id.* at 649–50, 53 S.Ct. at 776.

In the present case, Harborlite named as defendants over 400 railroads, including all railroads operating between the western perlite areas and the East. In addition, it presented evidence of a common participation by certain of these railroads both in rates from Superior and in rates from the competitive origins to identical eastern destinations. J.A. at 25, 288 (statements of William G. Blunt). *See also id.* at 245 (statement of Robert G. Rodell). Harborlite's theory before the Commission was as follows:

> All the railroads operating between Arizona, Colorado, and New Mexico, on the one hand, and, states east of the Mississippi River, on the other, have been named as defendants in this proceeding. As directly pertinent to this discussion, the destinations and customers to which Harborlite and its competitors are attempting to ship are all served by the same delivering railroads . . . . Thus, the rates established from all the involved origins to this common destination territory are sufficiently under the control of these common delivering roads as to warrant a finding of violation of Section 3(1) of the Act. *Fargo Chamber of Commerce v. Akron, C. & U. R. Co.*, 306 I.C.C. 407, 413 (1959); *Brazos River Harbor Nev. Dist. v. Abilene & S. Ry. Co.*, 319 I.C.C. 54, 68 (1963) and cases there cited.

J.A. at 165–66 (opening argument of Harborlite Corp.). *See also id.* at 359–60 (reply

---

**25.** The dissenting member of the Board found that the injury element was proved, stating: The firm has been able to participate only minimally in the market east of the Mississippi for expanded product and not at all for the crude. Complainant's testimony regarding lost sales confirms its basic premise that the inability to compete in the area stems from relatively higher rates than those paid by its competitors. Complainant's premise and testimony are particularly credible when rates

bear such a high percentage to the price of the product. In addition, intervenors' evidence corroborates the intense competition for sales. Thus, injury for the future can be presumed. Compare *Prince Albert Pulp Co., Ltd. v. Canadian Natl. Rys.*, 349 I.C.C. 482, 494 (1974), and cases cited there. Review Board Opinion at 15–16 (Shaw, Board Member, dissenting in part), *reprinted in* J.A. at 378–79.

argument of Harborlite Corp.). In essence, it was (and is) Harborlite's position that the existence of common railroads participating in joint rates both from the allegedly preferred and the allegedly prejudiced origins, coupled with the presence as defendants of all possible alternative carriers, suffices to establish the element of common control.

We express no view on the merit of Harborlite's theory. We do note, however, that the issue is complex [26] and that Harborlite's position is not without precedential support. In *Fargo Chamber of Commerce v. Akron, Canton & Youngstown Railroad*, 306 I.C.C. 407 (1959), a case cited by Harborlite before the Commission, the ICC stated:

> Our power to prevent carriers from making undue preferences and prejudices is not restricted to points reached by their rails. Carriers are jointly and severally responsible for undue prejudice and preference where they participate in some way in that which causes the unlawfulness, as where a lower joint rate is given to one locality than to another similarly situated. *Central R. Co. of New Jersey v. United States*, 257 U.S. 247, 259, [42 S.Ct. 80, 66 L.Ed. 217]. The eastern carriers participate in both the joint rates to Fargo and those to the Twin Cities. It is within their power to put an end to the undue prejudice and preference herein found to exist.

*Id.* at 413. *See also Fresh Meats from Illinois, Indiana, Kentucky, Ohio, and Missouri to Points in Florida*, 318 I.C.C. 5, 10–11 (1962). In *Prince Albert Pulp Co. v. Canadian National Railways*, 349 I.C.C. 482,

492 (1974), the Commission apparently found the common control element satisfied by the mere existence of joint rates: "Since the assailed rates are all joint rates, there is no question but what the defendants are responsible for whatever undue preference and prejudice is found herein to exist." [27]

The Review Board in the present case, although it rejected Harborlite's section 3(1) claim, did not base its decision on a failure to establish this element. Moreover, the dissenter on the Review Board found Harborlite's presentation so convincing that he thought common control was evident: "Given the widespread applicability of the rates, it is obvious that the defendants as a group are in common control of the rates." Review Board Opinion at 16 (Shaw, Board Member, dissenting in part), *reprinted in* J.A. at 379. The Division, however, in the final sentence of its brief examination of the section 3(1) issue, made the following conclusory determination to the contrary: "Additionally, there is no carrier or group of carriers which is the common source of the rate prejudice and which effectively participates in both the prejudiced traffic and the preferred traffic." Division Opinion at 2, *reprinted in* J.A. at 385. Nothing more was said in response to Harborlite's presentation and argument on this point.

This sort of precipitant assertion by an administrative agency does little to aid a court in its task of reviewing the complex issues of mixed law and fact that often arise from administrative adjudication. We are given not a glimpse of any of the

26. *See generally Ayrshire Colleries Corp. v. United States*, 335 U.S. 573, 593–94, 69 S.Ct. 278, 93 L.Ed. 243 (1949); *New York v. United States*, 331 U.S. 284, 340–43, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); *Texas & Pac. Ry. v. United States*, 289 U.S. 627, 646–55, 53 S.Ct. 768, 77 L.Ed. 1410 (1933); *Farmers Union Cent. Exch. v. FERC*, 189 U.S.App.D.C. 250, 264 n.36, 584 F.2d 408, 422 n.36 (D.C.Cir.), *cert. denied*, 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978); *New York Cent. R.R. v. United States*, 207 F.Supp. 483, 489–90 (S.D.N.Y.1962) (three-judge court) (Friendly, J.); *Feed Grains to New England*, 356 I.C.C. 678, 691 (1977); *Investigation of R.R. Freight Rate Structure—Export-Import Rates and Charges—Great Lakes*, 345 I.C.C. 1364, 1435 (1976); *Petroleum Prods.,*

*Williams Bros. Pipe Line Co.*, 351 I.C.C. 102, 121 (1975), *modified sub nom. Farmers Union Cent. Exch. v. FERC*, 189 U.S.App.D.C. 250, 584 F.2d 408 (D.C.Cir.), *cert. denied*, 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978).

27. *Cf. New York v. United States*, 331 U.S. 284, 342–43, 67 S.Ct. 1207, 1238, 91 L.Ed. 1492 (1947) ("If the hands of the Commission are tied and it is powerless to protect regions and territories from discrimination unless all rates involved in the rate relationship are controlled by the same carriers, then the 1940 amendment to § 3(1) fell far short of its goal. We do not believe Congress left the Commission so impotent.").

thoughtful reasoning that might lie behind the agency's inscrutable statement. This type of agency decisionmaking can only frustrate the courts assigned the difficult task of review and burden the agency itself with the additional work necessitated by a remand. In the place of the conclusory statement offered here by the Commission,

> [w]hat we contemplate is that the [agency] will identify, and be reviewed on the basis of the identification of, the salient underlying considerations and type of evidence relied on . . . . This is not a hypertechnical requirement. It is rather the basic precondition of any intelligible administrative scheme that has as an important constituent element a provision for judicial review. If indeed it is to be the administrative decision that is reviewed, the administrators must focus the court's attention on the reasons for the decision and the court must review it on those reasons.

*United States ex rel. Checkman v. Laird,* 469 F.2d 773, 781 (2d Cir. 1972) (Leventhal, J., sitting by designation). We find that the ICC's impenetrable one-sentence "analysis" does not square with the mandate of findings and reasons.

D. *Justification for Rate Disparity*

 Even if a complainant proves that a group of carriers, satisfying the common control requirement, is responsible for a rate disparity that has caused competitive injury, this does not conclusively establish the existence of "undue or unreasonable" discrimination in violation of section 3(1). Rather, the carriers have an opportunity to overcome the complainant's prima facie case by themselves proving that the rate disparity is justified by differences in transportation circumstances. *Chicago & Eastern Illinois Railroad v. United States,* 384 F.Supp. at 300–01. That is, the disparity is not unlawful if it is "justified by the cost of the respective services, by their values, or by other transportation conditions." *United States v. Illinois Central Railroad,* 263

U.S. 515, 524, 44 S.Ct. 189, 193, 68 L.Ed. 417 (1924).

 It is insufficient for the carriers to show that transportation circumstances are not identical for the allegedly preferred and the allegedly prejudiced shipments, for the question is not whether *any* disparity is warranted. What the carriers must justify is the particular disparity existing in the case under consideration. *See New York v. United States,* 331 U.S. 284, 328, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). *See also Western Pacific Railroad v. United States,* 263 F.Supp. 140, 145 (N.D.Cal.1966) (three-judge court); *Furniture from St. Louis, Mo., to the Southwest,* 272 I.C.C. 665, 668 (1948).

In the present case, the railroads presented some evidence that operating conditions from Superior differed from those on routes originating at the competitive locations. In particular, the railroads' main witness stated in general terms that the

> operating conditions are different [and] . . . the overall volume and consistency of movement of crude perlite is much greater from Antonito than from Superior; . . . the traffic from Superior originates on an independent short-line railroad whereas from Antonito it originates on the D&RGW; [and] the same market competition may not exist at the different destination points, etc.

J.A. at 261 (statement of Edward Maki). In addition, the witness quoted a 1925 ICC valuation report suggesting that the short-line railroad serving Superior would have higher-than-usual operating costs because of sharp curves and frequent washouts. *Id.* at 261–62.[28] Harborlite rebutted this testimony by explaining that the railroad described in the 1925 report had been rebuilt in 1973 to eliminate previous operating problems. *Id.* at 288–89 (statement of William G. Blunt). Harborlite also presented evidence that maintenance expense per mile on the short-line is actually *lower* than

---

**28.** Harborlite characterizes this testimony as being "evidently pieced together in large part from various old materials which [the witness]

could conveniently find around his office." Brief for Petitioner at 30.

could be expected for railroads serving the competitive origins and that the short-line actually has less snowfall and more favorable grades than do lines from the competitive origins. *Id.* at 289–90.

As on the issue of common control, the Division, following a Review Board report that was silent on the matter, dealt in summary fashion with the question of justification:

> Furthermore, any rate disparity between Harborlite and its competitors on movements of equal distance is justified because of the substantial dissimilarity in transportation and operating conditions. Not only are the movements over different rail lines and different routes, but the hazards of transportation on the movements vary.

Division Opinion at 2, *reprinted in* J.A. at 385. Given the evidence before it, we find it somewhat difficult to discern how the Commission could arrive at this determination.[29] More basically, however, the Division's conclusory comments are subject to criticisms similar to those we have expressed on its treatment of the issue of common control. *See* pp. 1098–1100 *supra.* What are the "substantial dissimilarity in transportation and operating conditions" and the "hazards" to which the opinion refers? We agree with Harborlite that for us to defer to these "generalized recitals . . . [would be] stretching the poetic license of administrative 'expertise' beyond reasonable bounds." Brief for Petitioner at 26. The words of the Supreme Court in *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), are equally appropriate here:

> There are no findings and no analysis here to justify the choice made, no indica-

tion of the basis on which the Commission exercised its expert discretion. . . . Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion."

*Id.* at 167, 83 S.Ct. at 245 (quoting *New York v. United States,* 342 U.S. 882, 884, 72 S.Ct. 152, 96 L.Ed. 662 (1951) (Douglas, J., dissenting) (emphasis in original) ).[30]

In any event, in light of its ambiguous statements on whether, or to what extent, a disparity was found to exist, *see* pp. 1094–1096 *supra,* the Commission's assurance that "any rate disparity" would be justified cannot suffice as a finding of justification, for the differing transportation circumstances must be found to warrant the *degree* of disparity found to be present. "If the ICC is to refuse plaintiffs' relief on the ground that the disparity is justified, it must first examine the disparity that exists in the light of the assertedly justifying conditions and determine whether the conditions justify *that great* a disparity." *Stanislaus County v. United States,* 193 F.Supp. 145, 148 (N.D.Cal.1960) (three-judge court) (emphasis added). *See also ICC v. Mechling,* 330 U.S. 567, 583, 67 S.Ct. 894, 91 L.Ed. 1102 (1947).

### V. CONCLUSION

We do not hold that the Commission was compelled, on the facts before it, to find a violation of the statutory provision here in question. What troubles us is that the agency's failure to do so, especially in light

---

**29.** The Review Board itself compared railroad revenue-to-cost ratios for selected movements from Superior and from the competitive origins and found the ratios from Superior to be some 30% higher than those from the other origins. *See* Review Board Opinion at 9–10, app. at 4, *reprinted in* J.A. at 372–73, 383. These findings, adopted by the Division, would seem to suggest that cost differences resulting from varying transportation conditions cannot fully explain the disparity alleged by Harborlite.

The fact that different docket territories are involved in this case, *see* note 20 *supra,* might be relevant on the question of justification. For the Commission to rely on this factor, however, it would have to articulate such reliance and state reasons showing the reliance to be reasonable.

**30.** *Cf. ASG Industries, Inc. v. United States,* 548 F.2d 147, 154 (6th Cir. 1977) ("It is not enough for an administrative agency to assert 'expertise' as a defense for all seasons.").

of the forceful evidence presented by the complainant, was not explained

> with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the . . . findings of an administrative agency. We must know what a decision means before the duty becomes ours to say whether it is right or wrong.

*United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad,* 294 U.S. 499, 510–11, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935) (Cardozo, J.) (citations omitted). Because the Commission's cryptic opinions do not comport with this fundamental requirement of administrative law, we must remand this case for further proceedings consistent with this opinion.

*It is so ordered.*