The **BALTIMORE AND ANNAPOLIS RAILROAD COMPANY, a Maryland Corporation, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION (WMATC), Respondent.**

No. 78–2222.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1980.

Decided Oct. 1, 1980.

Joseph I. Huesman, Baltimore, Md., for petitioner.

Gregory Paul Barth, Washington, D. C., with whom Joel C. Weingarten was on brief, for respondent.

Before TAMM and MacKINNON, Circuit Judges, and LOUIS F. OBERDORFER,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In 1976 the Washington Metropolitan Area Transit Commission (Commission) overruled *sub silentio* a decision in effect for the previous twelve years by asserting jurisdiction over the Baltimore & Annapolis Railroad's (B & A) special and charter motor carrier operations between points within the Washington Metropolitan Area Transit District, operations that the B & A operated as an incident to its interstate regular route service. Because an agency cannot abandon a rule established by its precedent without first stating its reasons for doing so, we vacate the Commission's Order No. 1870 and Order No. 1899, and we remand this case to the Commission for further proceedings, if any, consistent with this opinion.

I

The Washington metropolitan area consists of the District of Columbia and surrounding portions of the State of Maryland

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

and the Commonwealth of Virginia. Prior to 1960, four separate agencies regulated the region's mass transit: one commission controlled the transit within each jurisdiction, and the federal government's Interstate Commerce Commission (ICC) controlled the transit moving from one jurisdiction to another. This arrangement became increasingly unwieldy, however, as the area's population, geographical size, and transportation volume grew rapidly. After concluding that regional transportation problems require regional solutions, the Congress, the State of Maryland, the Commonwealth of Virginia, and the District of Columbia entered into the Washington Metropolitan Area Transit Regulation Compact (Compact), Pub.L. No. 86–794, 74 Stat. 1031 (1960),[1] to implement one step in the regional approach.

The first article of the Compact delineates a Washington Metropolitan Area Transit District (Metropolitan District).[2] To regulate transit within the Metropolitan District, the Compact created the Washington Metropolitan Area Transit Commission. Compact, art. II. The Commission is empowered to issue certificates of public convenience and necessity, control routes and services, and prescribe fares, regulations, and practices. See id. art. XII, §§ 4–16.

Before the Compact came into existence, petitioner B & A received an ICC certificate of public convenience and necessity to operate a regular route between Washington, D. C., within the Metropolitan District, and Ft. Meade, Maryland, outside the Metropolitan District. B & A also offered service to special and charter parties–both wholly within the Metropolitan District and between points within and outside the District–as an incident to the ICC certificate, under the authority of the Motor Carrier Act of 1935, § 208(c), 49 U.S.C. § 308(c) (1958) (current version at 49 U.S.C. § 10932(c) (Supp. II 1978)).[3]

In June of 1961, after enactment of the Compact, B & A and several other similarly situated carriers filed with the Commission, pursuant to article XII, section 4(a) of the Compact,[4] a "grandfather" application for a certificate of public convenience and necessity to cover regular and charter service within the Metropolitan District. Three years later, the Commission issued Order No. 366 dismissing the applications because "the transportation for which authority is

1. The text of the Compact is also published in full at D.C.Code § 1–1410 note (1973) and Md. Trans. Code Ann. § 10–203 (1977).

2. The Washington Metropolitan Area Transit Regulation Compact (Compact) defines the Washington Metropolitan Area Transit District as

embrac[ing] the District of Columbia, the cities of Alexandria and Falls Church, the counties of Arlington and Fairfax, and political subdivisions of the State of Virginia located within those counties and that portion of Loudoun County, Virginia, occupied by the Dulles International Airport and the counties of Montgomery and Prince Georges, in the State of Maryland and political subdivisions of the State of Maryland located within said counties, and all other cities now or hereafter existing in Maryland or Virginia within the geographic area bounded by the outer boundaries of the combined area of said counties, cities and airport.

Compact, art. I.

3. Section 208(c) of the Motor Carrier Act of 1935, 49 U.S.C. § 308(c) (1958) provides in relevant part:

Any common carrier by motor vehicle transporting passengers under a[n ICC] certificate ... may transport in interstate or foreign commerce to any place special or chartered parties under such rules and regulations as the Commission shall have prescribed.

4. Although the Compact states that "[n]o person shall engage in transportation subject to [the Compact] unless there is in force a certificate of public convenience and necessity issued by the Commission authorizing such person to engage in such transportation," Compact, art. XII, § 4(a), some relief from this requirement is given by providing that

if any person was bona fide engaged in transportation subject to [the Compact] on the effective date of [the Compact], the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within 90 days after the effective date of [the Compact].

Id.

sought is exempt from the jurisdiction of the Commission pursuant to Section 1(a)(4), Article XII, Title II, of the Compact, as amended." *Greyhound Corp.*, Order No. 366, at 1 (WMATC July 17, 1964), *reprinted in* Joint Appendix (J.A.) 50, 50.[5] The Commission noted that the dismissal was without prejudice and thus that B & A and the other carriers would be allowed to resubmit their applications should the Commission revise its jurisdictional decision at some later time. *Id.* at 2, *reprinted in* J.A. at 51.

During the next twelve years B & A continued its regular and charter operations without Commission regulation or challenge. In May of 1973, however, correspondence between the Commission and B & A led B & A to believe the Commission had changed its mind and therefore that renewal of the 1961 application was necessary. On June 9, 1976, B & A again sought authority to operate sightseeing and transfer service within the Metropolitan District, but less than two weeks later, amended that application to state that it was being filed under protest because section 20(a)(2) of article XII of the Compact excluded incidental special and charter rights from the Commission's jurisdiction.[6] B & A moved that the Commission dismiss or stay action on the application.

On July 30, 1976, without a hearing, findings of fact, or reconsideration of Order No. 366, the Commission denied B & A's motions and application. *See Baltimore & Annapolis Railroad*, Order No. 1582 (WMATC July 30, 1976), *reprinted in* J.A. at 79–84. According to the Commission, because B & A's regular route authority had not been suspended by the Compact, B & A's special and charter service between points within the Metropolitan District was not entitled to treatment under section 20(a)(2). The Commission concluded that B & A must obtain certificated authority in the usual manner. B & A was ordered to cease and desist its operations within the Metropolitan District, but a continuance was granted to allow prosecution of the certificate application. Shortly thereafter, the Commission denied B & A's motion for reconsideration.

A prehearing conference and a public hearing were held, but before the Commission could make its ruling, B & A withdrew the pending application. The Commission responded by seeking judicial enforcement of the cease and desist order. In March of 1977, Judge Barrington D. Parker of the United States District Court for the District of Columbia denied the Commission's motion for summary judgment and remanded the case to the Commission for development of a record to support the Commission's belief that B & A's operations were unlawful, especially in light of the Commission's Order No. 366. *See WMATC v. Baltimore & Annapolis Railroad*, Civ. No. 76–1690 (D.D.C. Mar. 1, 1977) (memorandum order), *reprinted in* J.A. at 150–55.

In accordance with the district court's decision, the Commission initiated the development of a record by directing B & A to show cause why it should not be ordered to cease operations between points within the Metropolitan District. The Commission conducted a hearing, and on August 8, 1978, issued Order No. 1870, which affirmed the 1976 decision reasserting jurisdiction over B & A's service in question, dismissed B & A's 1976 application, incorporated the record of

---

5. Section 1(a)(4) exempts from the Commission's authority transportation "in the course of an operation over a regular route, between a point in the Metropolitan District and a point outside the Metropolitan District, including transportation between points on such regular route within the Metropolitan District as to interstate and foreign commerce," provided the regular route service is authorized by an ICC certificate of public convenience and necessity or by an ICC permit. Compact, art. XII, § 1(a)(4). *See* pages 1371–1373 *infra.*

6. Section 20(a)(2) of article XII of the Compact provides that certificates issued by the ICC to any carrier subject to the jurisdiction of the WMATC shall be suspended provided that:

such suspension shall not affect the authority of such certificate or permit–holder to transport special and chartered parties as now authorized by the Interstate Commerce Act [, § 208(c), 49 U.S.C. § 308(c) (1958),] and the rules and regulations promulgated thereunder by the Interstate Commerce Commission, notwithstanding any other provisions of [the Compact].

the 1976 application into the record of the 1961 version, and granted B & A sixty days to prosecute its request. *See Baltimore & Annapolis Railroad,* Order No. 1870 (WMATC Aug. 8, 1978), *reprinted in* J.A. at 327–31. Two months later, the Commission issued Order No. 1899, which denied B & A's motion for reconsideration and ordered B & A to cease and desist its special and charter operations within the Metropolitan District. *See Baltimore & Annapolis Railroad,* Order No. 1899 (WMATC Oct. 4, 1978), *reprinted in* J.A. at 337–40. B & A subsequently petitioned this court for review of these last two Commission orders.[7]

## II

It is clear to us that the Commission's Order No. 1870 cannot be reconciled with its predecessor, Order No. 366. The Commission's interpretation of its jurisdiction in Order No. 1870–namely, that "there is no . . . exception for service performed solely between points in the Metropolitan District, whether they are incidental to ICC authority or not," *Baltimore & Annapolis Railroad,* Order No. 1870, at 4 (Aug. 8, 1978), *reprinted in* J.A. at 327, 330–plainly contradicts the Commission's disavowal of jurisdiction in Order No. 366. There are no factual distinctions to explain this manifest inconsistency. The Commission does not claim that B & A's charter operations at the time of Order No. 1870 differ from those at the time of Order No. 366. The Commission itself stated in Order No. 1870 that "[t]he evidence of record tends to indicate that the charter service presently offered by B & A in the Metropolitan District is similar to that being conducted at the time the Compact became effective." *Id.* at 3, *reprinted in* J.A. at 329.

Attacking this Commission change in interpretation, B & A contends that the doctrine of res judicata binds the Commission to its decision in Order No. 366. B & A consequently believes the Commission is left powerless to adopt a different position in Order No. 1870 or to direct B & A, by Order No. 1899, to cease and desist its operations between points within the Metropolitan District. We disagree that res judicata applies to this specific case.

The Commission concedes, as it must, that the doctrine of res judicata is applicable to administrative agencies in appropriate situations. As the Supreme Court stated in *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *Id.* at 421–22. *See* 2 K. Davis, Administrative Law Treatise § 18.02 (1958 & Supp. 1970). The Commission does not argue that it issued Order No. 366 in other than a judicial capacity or that the proceedings leading to Order No. 366 afforded any party an inadequate opportunity to litigate.

Nevertheless, only a final judgment can form the basis for imposing res judicata, *see, e. g., Semler v. Washington Psychiatric Institute,* 575 F.2d 922, 927 (D.C. Cir. 1978), and the Commission's Order No. 366 was not a final judgment. Professor Davis notes that "[i]f an agency dismisses a case with reservation of jurisdiction to reinstate the proceeding, no final action on the merits has been taken which can be res judicata. The same is true when the dismissal is denominated 'without prejudice.'" 2 K. Davis, *supra,* § 18.06 at 584 (1958). The Commission's order stated expressly that B & A's application was being dismissed without prejudice, so as to allow renewal of the

---

7. The Compact grants this court jurisdiction to review Commission decisions. *See* Compact, art. XII, § 17(a).

B & A also petitioned the Commission and this court for a stay of the Commission's cease and desist order. The Commission denied the motion. *See Baltimore & Annapolis Railroad,*

Order No. 1941 (WMATC Dec. 14, 1978), *reprinted in* J.A. at 343–46. In March of 1979 a division of this court granted a stay of Order No. 1899 pending our review. *See Baltimore & Annapolis RR. v. WMATC,* No. 78–2222 (D.C. Cir. March 26, 1979) (per curiam) (order granting stay).

application should a subsequent Commission determination of its jurisdiction make renewal necessary. *See Greyhound Corp.*, Order No. 366, at 2 (WMATC June 17, 1964), *reprinted in* J.A. at 50, 51. The Commission thereby left open the possibility that a different determination of jurisdiction might be made in the future. Therefore we are unable to conclude that the doctrine of res judicata binds the Commission to the interpretation made in Order No. 366. *See also Hastings Manufacturing Co. v. FTC*, 153 F.2d 253 (6th Cir.), *cert. denied*, 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626 (1946); *Parke, A. & L. v. FTC*, 142 F.2d 437 (2d Cir.), *cert. denied*, 323 U.S. 753, 65 S.Ct. 86, 89 L.Ed. 603 (1944).

### III

██ Although an agency, when not bound by the doctrine of res judicata, is free to revise its interpretations, *see, e. g., Greyhound Corp. v. ICC*, 551 F.2d 414, 416 (D.C. Cir. 1977) (per curiam); *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) v. NLRB*, 459 F.2d 1329, 1341 (D.C. Cir. 1971), " 'when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.' " *Greyhound Corp. v. ICC*, 551 F.2d at 416 (quoting *Columbia Broadcasting System, Inc. v. FCC*, 454 F.2d 1018, 1026 (D.C. Cir. 1971)). The Commission cannot replace its conclusion that it lacks jurisdiction over incidental special and charter transportation services, as expressed in Order No. 366, with a different view, unless the announcement of that different view is accompanied by an explanation of the Commission's reasons for making the change. Furthermore, the reasons contained in the explanation must be consistent with law and supported by substantial evidence on the record.

██ Even absent special circumstances, it is vital that an agency justify a departure from its prior determinations. First, the requirement of reasons imposes a measure

of discipline on the agency, discouraging arbitrary or capricious action by demanding a rational and considered discussion of the need for a new agency standard. The process of providing a rationale that can withstand public and judicial scrutiny compels the agency to take rule changes seriously. The agency will be less likely to make changes that are not supported by the relevant law and facts. Second, the requirement of reasons fulfills the duty of fairness and justice owed by the agency to the party or parties "victimized" by the agency's decision to shift its course. As we observed earlier this term, " 'a disappointed party, whether he plans further proceedings or not, deserves to have the satisfaction of knowing why he lost his case.' " *Harborlite Corp. v. ICC*, 613 F.2d 1088, 1092 n.7 (D.C. Cir. 1979) (quoting 2 K. Davis, *supra*, § 16.05 at 448 (1958)). Third, and perhaps most important of all, the requirement of reasons facilitates judicial review. " '[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.' " *Id.* at 1092 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)). The burden of justifying an agency decision, especially an agency's decision that contradicts one of its prior decisions, properly belongs to the agency itself and not to the courts. *See, e. g., SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Harborlite Corp. v. ICC*, 613 F.2d at 1092–93. *See also Chamber of Commerce of the United States v. OSHA*, 636 F.2d 464 at 471 (D.C. Cir. 1980). It is not for us to fill the explanatory void by supplying reasons for an agency's action.

██ In the particular case *sub judice*, however, the need for an agency explanation is especially compelling. One factor giving extra emphasis to the need for a statement of reasons is the nature of the review we must conduct. The Commission's most recent construction of section

1(a)(4) of article XII of the Compact,[8] albeit less than controlling authority for our purposes, "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *See, e. g., International Packers, Ltd. v. FMC*, 356 F.2d 808, 811 (D.C. Cir. 1966). Nevertheless, the weight we accord an agency interpretation is determined in part by the interpretation's consistency with prior agency pronouncements, *see id.*, as well as the length of time the agency has applied its interpretation and whether the agency made its interpretation contemporaneously with the enactment of the statute, *see NLRB v. Boeing Co.*, 412 U.S. 67, 74–75, 93 S.Ct. 1952, 1956–1957, 36 L.Ed.2d 752 (1973); *Commissioner v. Estate of Sternberger*, 348 U.S. 187, 199, 75 S.Ct. 229, 235, 99 L.Ed. 246 (1955). *See generally* 2 K. Davis, *supra*, § 7:14 at 64–66 (2d ed. 1979).

The Commission's view of its jurisdiction announced in Order No. 1870 attempts to overturn the position indicated by Order No. 366, an order issued only a few years after enactment of the Compact and allowed to stand without challenge or contradiction for more than twelve years. Given the comparative novelty of the conclusion expressed in Order No. 1870 and its lack of consistency with a prior Commission ruling, we find ourselves obliged to do more than merely defer to the Commission's conclusion that section 1(a)(4) does not provide a jurisdictional exception for special and charter services offered as an incident to an ICC regular route certificate. We must make an independent judgment, examining with a more exacting vigilance than we might have employed had the Commission's decisions not conflicted. A demanding judicial review is also indicated by the consequences of the Commission's latest interpretation. Order No. 1870 acknowledges a narrower

scope for section 1(a)(4), and a broader jurisdiction for the Commission, than were recognized by Order No. 366, and "[e]fforts of an administrator or administrative agency to enlarge or restrict the application of a statute should be subjected to close scrutiny." *Celebrezze v. Kilborn*, 322 F.2d 166, 169 (5th Cir. 1963). Because "[t]he degree of precision required in an agency's findings and reasons is directly related to the level of judicial scrutiny to which the agency decision is subject," *Harborlite Corp. v. ICC*, 613 F.2d at 1093, the Commission must make a special effort to explain carefully and in detail why it seeks to substitute Order No. 1870's understanding of section 1(a)(4) for the understanding contained in Order No. 366.

A second factor making a statement of reasons for adopting the new interpretation particularly imperative is that, at least after a superficial and preliminary study, the Commission's first jurisdictional analysis, which Order No. 1870 attempts to replace, appears to have considerable support in the Compact's language, legislative history, and legislative scheme.[9] *See also* 2 K. Davis, *supra*, § 17.07 at 132–33 (Supp.1978). We begin with the plain language of the Compact itself. *See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *McCord v. Bailey*, 636 F.2d 606, at 614 (D.C. Cir. 1980). Section 1(a)(4) excepts from the Commission's authority "transportation performed *in the course of* an operation over a regular route, between a point in the Metropolitan District and a point outside the Metropolitan District ...." Compact, art. XII, § 1(a)(4) (emphasis added). B & A's special and charter services are an incident to the regular route service it offers. One could therefore say that the special and charter services are performed "in the course of" regular route operations.

Aspects of the Compact's legislative history and scheme seemingly bolster this con-

---

**8.** *See* note 5 *supra* and accompanying text.

**9.** Our construction of § 1 (a)(4) is solely for the purpose of demonstrating the special need for a Commission statement of reasons. Any final and dispositive judicial determination must be

delayed until the Commission supplies an adequate statement. If we are called upon to review that statement, we may well reach a conclusion different from that intimated by our decision today. *See* page 1373 *infra*.

struction. Congress was concerned about the continued viability of interstate transportation after creation of the Metropolitan District and the Commission. During congressional consideration of the Compact, the ICC complained that the proposed division of jurisdiction between the ICC and the Commission lacked adequate clarity.[10] *See D.C. Transit System, Inc. v. WMATC*, 420 F.2d 226, 228 nn.1 & 2 (D.C. Cir. 1969). *See generally Hearings on H.J. Res. 402 Before Subcomm. No. 3 of the House Comm. on the Judiciary*, 86th Cong., 2d Sess., pt. 2, at 205 (1960) (text of original version of section 1(a)(4)); *id.* at 242–43, 257–58 (testimony and statement of Jerome M. Alper); *id.* at 261 (text of amended section 1(a)(4)). The ICC contended in part that because a carrier's service to intermediate points was essential to the economic feasibility of operating the entire regular route, Commission regulation of intermediate point service would allow the Commission to make it unprofitable for a carrier to offer the interstate service that the ICC had determined

to be in the public convenience and necessity. *See* S.Rep. No. 1906, 86th Cong., 2d Sess. 42 (1960) [hereinafter cited as Senate Report]; H.Rep. No. 1625, 86th Cong., 2nd Sess. 39 (1960) [hereinafter cited as House Report]. Both the Senate and House Judiciary Committees acknowledged the ICC's objection and recast the language of the Compact's jurisdictional section to its present form. *See* Senate Report at 25; House Report at 21–22.[11]

Commission regulation of incidental special and charter service might defeat Congress's desire to preserve exclusive ICC control over interstate regular route transportation. Like service to intermediate points, incidental special and charter service can be essential to the economic feasibility of the underlying regular route transportation.[12] Like Commission regulation of service to intermediate points, Commission regulation of incidental special and charter service would allow the indirect destruction of the same regular route transportation that the ICC had already found to be desirable.

**10.** Article VIII of the Compact provides that congressional approval "suspend[s] the applicability of the Interstate Commerce Act . . . and any other laws of the United States, to the persons, companies and activities which are subject to [the Compact], to the extent that such laws are inconsistent with, or in duplication of, the jurisdiction of the Commission . . . ." Thus whatever jurisdiction is conferred upon the Commission is jurisdiction removed from the ICC. In the original House Resolution containing the Compact, the relevant description of the Commission's authority was as follows:

1. (a) [The Compact] shall apply to the transportation for hire by any carrier of persons between any points in the Metropolitan District and to the persons engaged in rendering or performing such transportation service, except–

. . . . .

(4) transportation performed in the course of an operation over a regular route, the major portion of which is outside the Metropolitan District except where a major portion of the passenger traffic begins and ends within the Metropolitan District . . . .

*Hearings on H.J. Res. 402 Before Subcomm. No. 3 of the House Comm. on the Judiciary*, 86th Cong., 1st Sess., pt. 1, at 5 (1959).

**11.** Congress approved the Compact in 1960, but consent to the suspension provision, *see* note 10 *supra*, was made contingent upon the compacting parties' ratification of a modified

§ 1(a)(4), the language of which is set forth in note 5 *supra*. *See* Washington Metropolitan Area Transit Regulation Compact, Pub.L. No. 86–794, § 5, 74 Stat. 1031 (1960). The congressional alteration was ratified in 1962, and the section as amended replaced the original version.

**12.** Six years after enactment of the Compact the House Committee on Interstate and Foreign Commerce observed that "many motorbus carriers are able to render regularly scheduled service essential to thousands of communities because revenues from charter service offset operating losses incurred on certain intercity schedules" and that "[i]n some instances regular route passenger bus service would be discontinued were it not for charter revenues." H. Rep. No. 2265, 89th Cong., 2d Sess. 2 (1966). *See* S. Rep. No. 1552, 89th Cong., 2d Sess. 3 (1966); *Bus Charter Rights and Agricultural Cooperative Transportation: Hearings Before the Surface Transportation Subcomm. of the Sen. Comm. on Commerce*, 89th Cong., 2d Sess. 4 (1966) (statement of John W. Bush); *id.* 8–9 (statement of Everett Hutchinson); *Incidental Bus Charter Rights: Hearings Before Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce*, 89th Cong., 2d Sess. 2 (1966) (statement of John W. Bush); *id.* 5 (statement of Everett Hutchinson).

Admittedly, the ICC's interest in protecting interstate motor carrier routes overlaps the Commission's interest in regulating all bus transportation operated exclusively within the Metropolitan District, including transportation between intermediate points along an interstate regular route, or special and charter transportation incidental to regular route service. The compacting parties discussed this overlap before the Compact received congressional approval, and the decision was apparently made to resolve overlapping interests in favor of the ICC. As the counsel for the various jurisdictions and governmental organizations advocating the Compact testified before a Senate subcommittee:

> There will be some traffic [even under the Compact as amended] which would be primarily of concern to the Compact Commission, but which the ICC will have to take. But if you did it the other way, you would have the reverse of the problem, or may have the reverse of the problem. So this is the policy that has been decided on. The ICC has agreed to this.

*District of Columbia, Maryland, and Virginia Mass Transit Compact: Hearings Before the Special Subcommittee of the Senate Committee on the Judiciary,* 86th Cong., 2d Sess. 105 (1960) (statement of Jerome M. Alper).

The analysis above is not our final word that the Commission's Order No. 366 is correct and its Order No. 1870 is not. *See* note 9 *supra.* Because of these initial thoughts, however, a Commission explanation of why it decided recently to abandon this reasoning could not be more vital.[13]

## CONCLUSION

Although we hold that the Commission is not bound to the conclusions expressed in

Order No. 366 by the doctrine of res judicata, the nature and timing of the Commission's change of course make it more essential than even under normal circumstances that it justify its altered interpretation of the Compact. It is not for us to provide the justification that the Commission omitted. *See* pages 1370–1371 *supra.* "It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Order No. 1870 and Order No. 1899 are hereby vacated, and the case is remanded to the Washington Metropolitan Area Transit Commission for whatever further proceedings that it may wish to conduct, if any, consistent with this opinion.[14]

*It is so ordered.*

---

**13.** Our initial and tentative thoughts on the merits of Order No. 366 not only emphasize the importance of such a justification to any subsequent judicial review, but also indicate to the Commission some of the questions it must now address.

**14.** B & A also contends that the Commission violated its own rules of practice and proce-

dure, failed to comply with a district court order, singled out B & A for disparate treatment, and finally, that even if the Commission has jurisdiction over B & A it should be ordered to grant B & A a certificate of public convenience and necessity without further hearing. Our disposition of the case makes it unnecessary to discuss these arguments at this time.