656 F.2d 1210

**BATON ROUGE MARINE CONTRAC-
TORS, INC., Petitioner,**

v.

**FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,**

Cargill, Inc., Intervenor.

No. 79–1502.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 30, 1980.

Decided May 4, 1981.

Edward S. Bagley, New Orleans, La., for petitioner.

Robert J. Wiggers, Dept. of Justice, Washington, D. C., with whom Robert B. Nicholson, Dept. of Justice, Washington, D. C., was on the brief, for respondent, United States of America.

John M. Binetti, Federal Maritime Commission, Washington, D. C., for respondent, Federal Maritime Commission. Carol J. Neustadt, Federal Maritime Commission, Washington, D. C., also entered an appearance for respondent, Federal Maritime Commission.

E. J. Sheppard, Washington, D. C., for intervenor.

Before ROBINSON, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Baton Rouge Marine Contractors, Inc. (BARMA), a stevedore, seeks review of an April 1979 report and order of the Federal Maritime Commission (FMC) upholding a "use of services and facilities" charge imposed by intervenor Cargill, Inc., terminal operator for the Port of Baton Rouge.[1] The Commission ruled that the charge Cargill levied against BARMA and all other stevedores was "just and reasonable," and therefore permissible under § 17 of the Shipping Act of 1916, 46 U.S.C. § 816 (1976). We find that the FMC departed from the approach it took at an earlier stage of this case, as well as from relevant precedent, without a clear explanation supported by substantial evidence. Accordingly, although this inordinately protracted proceeding is now approaching its tenth year, we must remand the matter to the FMC for further consideration.[2]

I.

Cargill, by lease agreement with the Port of Baton Rouge, holds the exclusive right to operate a public grain elevator at the Port. BARMA began stevedoring vessels at the Port when Cargill opened its facility there in 1955. In February 1971, Cargill exacted an "agreement" from all stevedores using its Baton Rouge facility. The agreement required the stevedores, *inter alia*, to pay five cents[3] per ton of grain handled by Cargill. Nonsigning stevedores would not be permitted to load vessels from Cargill facilities. *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.*, 18 F.M.C. 140, 146 (1975) ("1975 Report"), *aff'd sub nom. Cargill, Inc. v. FMC*, 530 F.2d 1062 (D.C.Cir.), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976).

BARMA signed under protest, and filed a complaint with the FMC. The agreement, BARMA alleged, violated § 17 of the Shipping Act[4] because the charge levied on

---

1. *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.*, No. 71–29 (1979), *reprinted in* Joint Appendix (J.A.) 149–77. Pursuant to 28 U.S.C. § 2342(3) (1976), the courts of appeals have exclusive jurisdiction over final orders of the FMC made reviewable under 46 U.S.C. § 830 (1976).

2. When the FMC's determination of the reasonableness of a charge under § 17 is overturned on review, remand is required; the FMC, not the court, must determine the relevant facts and initially explicate and apply the law thereto. *See Indiana Port Comm'n v. FMC*, 521 F.2d 281, 287 (D.C.Cir.1975). *See generally SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947); *Harborlite Corp. v. ICC*, 613 F.2d 1088, 1092–93 (D.C. Cir.1979).

3. The charge has been increased over time and now stands at ten cents per ton. *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.*, No. 71–29 (1979), slip op. at 4 n.3, J.A. 152.

4. Section 17 provides in relevant part:
   Every [common] carrier and every other person subject to this Act shall establish, ob-

stevedores was not reasonably related to the benefits they received from the services and facilities provided by Cargill.[5] Cargill defended the charge on the ground that its facilities—particularly its automated shipping gallery[6]—conferred substantial benefits on stevedores by permitting them to load grain more rapidly.

In its first response to BARMA's complaint, the Commission determined that, although a minor portion of the charge was shown to be reasonably related to benefits accruing to stevedores,[7] Cargill had not established an adequate justification for the bulk of the charge. Accordingly, the Commission rejected the charge as a whole as unreasonable, in violation of § 17. 1975 Report, *supra*, 18 F.M.C. at 161, 163.

In determining whether the charge was reasonable, the Commission focused upon the benefit, if any, bestowed upon stevedores by the automated shipping gallery. The Commission held that one-half the costs were properly allocated to the shipper (referred to as "cargo") because the gallery enables the grain to be loaded faster and more efficiently, thereby reducing loading expenses. *Id.* at 162. However, the FMC rejected the allocation of the remaining fifty percent entirely to the stevedore. It noted that in a previous decision,[8] it had allocated the costs of a shipping gallery

equally between cargo and *vessel. Id.* The Commission stated in its 1975 Report:

> Stevedores do not benefit from the speed and efficiency of the shipping gallery to the same extent as does either the cargo or the vessel .... [T]he cargo benefits by incurring lower loading expenses. The vessel benefits by having to spend fewer days in port for loading operations, thus allowing it to transport more shiploads over a shorter period of time. But no such benefit can be equated to stevedores. In fact, *it can be argued that the speed and efficiency of the shipping gallery works to the detriment of stevedores, providing shorter working hours by fewer men and therefore less revenues to the stevedores.* We recognize that the costs associated with the use of the shipping gallery are allocable to those who derive an economic and commercial benefit from the use thereof. *We do not, however, recognize that stevedores fall into this recipient category, at least not to the [same] degree as that of the cargo or the vessel. Id.* (Emphasis added.)

In like fashion, the Commission concluded that the structure which supports the shipping gallery, the grain dock and wharf, did not benefit the stevedores to the extent it benefited cargo or vessel. *Id.* at 162–63. The FMC also determined that certain costs

serve, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the [Commission] finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

5. BARMA also asserted that the unilateral imposition of the agreement by Cargill was an unauthorized extension of the rights granted to Cargill in its lease with the Port of Baton Rouge. This was unlawful, BARMA asserted, because the lease agreement and any amendments thereto must be approved by the Commission pursuant to § 15 of the Shipping Act, 46 U.S.C. § 814 (1976). In addition, BARMA attacked the charge as a discriminatory practice, in violation of § 16 of the Act, 46 U.S.C. § 815 (Supp. III 1979), because the charge favored Rogers Terminal & Shipping Corporation, Cargill's wholly-owned stevedore subsidiary and a BARMA competitor.

The Commission rejected BARMA's §§ 15 and 16 allegations. It determined that the lease between the Port and Cargill permitted Cargill to impose rules, rates, and regulations in the same manner as if it owned the facilities. 1975 Report, *supra*, 18 F.M.C. at 158–60. The FMC also held that the charge did not violate § 16 as long as it was imposed equally upon all stevedores, including Cargill's subsidiary. *Id.* at 160.

6. A shipping gallery is a conveyor system used to move grain from the elevator to a spout over a vessel.

7. This portion related to water, toilet, telephone, and utilities services; an allocation for Cargill's overhead costs; and uncontested costs associated with the use of trimming machines. 1975 Report, *supra*, 18 F.M.C. at 163.

8. Rates and Practices of Pacific Northwest Elevators Ass'n, 11 F.M.C. 369, 387 (1968).

associated with dock clean-up and liaison services were "unsubstantiated." *Id.* at 163. Because some charge was considered appropriate, the FMC remanded the matter to the Administrative Law Judge (ALJ) for "resolution of the sole issue of the proper allocation of services and facilities benefits to stevedores based upon actual use as outlined in this report." *Id.* at 164.[9]

Cargill filed a petition for review in this court, challenging the FMC's decision that the charge violated § 17. We upheld the Commission. *Cargill, Inc. v. FMC*, 530 F.2d 1062 (D.C.Cir.1976), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976).[10] Judge Leventhal commented on a feature of the case that has not been further elucidated on this appeal:

> One can make the economic argument that there is no difference in the long run whether the cost of the grain elevator is charged to the stevedore rather than the vessel, because the charges will be passed on to the party, usually the vessel, employing the stevedore to load and trim the vessel. In the long run, the stevedore's charge will be borne by the ultimate beneficiary of the services, the consumer, regardless of whether the stevedore is employed by and paid in the first instance by the vessel or shipper. But at least in the short run, different consequences will attach to differences in the immediate incidence of the charges, depending on the documents negotiated and entered into by the parties prior to the imposition of the new charges. Moreover, the separation out and identification of the various charges may have a kind of psychological spillover effect on the behavior of the various parties, which the Commission can properly take into account. *Id.* at 1068–69.

As to the merits of the Commission's decision, the court held that the FMC's "approach ... in disapproving certain allocations to the stevedore [was] not arbitrary and capricious." The court added that the Commission's order did not prevent "an interim levy by Cargill pending further determination of what may properly be assessed against the stevedore." *Id.* at 1066.

The matter thus returned to the ALJ, pursuant to the Commission's order, for further hearings relating to the allocation of benefits arising from the "actual use" of the terminal. *See* 1975 Report, *supra*, 18 F.M.C. at 164. The ALJ, in November 1977, again rejected as unsubstantiated per ton charges (six, eight, and ten cents) suggested by Cargill. J.A. 118. In a brief order, the Commission remanded the proceeding once more "for the formulation of a proper allocation formula based on the relative benefits derived from the use of Cargill's terminal facilities." *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.*, 20 F.M.C. 570, 571 (1978). On this remand, in May 1978, the ALJ adhered to his conclusion that Cargill's suggested per ton charges should be rejected. He ruled that the charge on stevedores should be limited to items found acceptable by the Commission in 1975. J.A. 146.[11]

In the April 1979 FMC decision now before us for review, the Commission rejected the ALJ's resolution of the controversy and determined that a ten cents per ton charge was reasonably related to services Cargill provided to stevedores and thus did not violate § 17. The Commission stated that its 1975 Report was not intended to limit Cargill's proof to cost allocations developed through an accounting formula. Instead,

---

**9.** The Commission further found that the agreement's indemnity requirements and waivers of liability were unreasonable practices under § 17. 1975 Report, *supra*, 18 F.M.C. at 164.

**10.** BARMA also filed a petition for review, challenging the FMC's determination that the charge did not violate §§ 15 or 16. We affirmed the FMC on these counts as well. *Cargill v. FMC, supra*, 530 F.2d at 1066–68. We further noted that BARMA had abandoned any

claim that *no* charge could be imposed by endorsing the Commission's application of § 17. *Id.* at 1071 n.17. Accordingly, BARMA and the United States are not comfortably situated to raise, at this late stage, claims that Cargill's method of enforcing its charge—refusal to allow nonsigning stevedores to load vessels—constitutes an illegal secondary boycott.

**11.** *See* note 7 *supra*.

the Commission viewed its previous mandate as allowing Cargill to demonstrate, "by any recognized standard, that its charge is reasonably related to services rendered." *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.*, No. 71–29 (1979) ("1979 Report"), slip op. at 18, J.A. 166.

The Commission referred to its earlier observation, in the 1975 Report, that the automated shipping gallery may actually hurt stevedores, but said that "[u]pon reflection we find that argument wanting." *Id.* at 19, J.A. 167. It viewed the record on remand as clearly establishing a benefit to stevedoring companies because their major cost, the hourly wages paid to longshoreworkers, is reduced by the increased speed and efficiency of the shipping gallery, while the price fixed by the stevedore for its services is based on a flat rate per ton of grain loaded aboard the vessel. *Id.*

The FMC acknowledged the record evidence that stevedore rates and profits per ton had been dramatically reduced since the introduction of the shipping gallery (as stated by the FMC, profit per ton dropped from approximately 75 cents to approximately two cents). However, the Commission determined not to dwell or "speculate" on the stevedores' drastic rate and profit reductions, in light of its conclusion that the gallery does reduce the stevedores' per unit costs "with a resultant increase in revenue." *Id.* at 21, J.A. 169. The Commission also found that several other aspects of the gallery operation inured to the benefit of the stevedores. *Id.* at 21–25, J.A. 169–73.[12]

Having concluded that stevedores derive substantial benefits from the use of Cargill's services and facilities, the FMC proceeded to determine whether the charge of ten cents per ton is unjust or unreasonable under § 17. The Commission said that costs associated with the high speed shipping gallery were merely one factor relevant to its

evaluation. Other factors had to be considered because precise allocation of costs among beneficiaries was not feasible. *Id.* at 26, J.A. 174; *see* Brief for Federal Maritime Commission at 17 (allocation of costs according to benefits various users derive is "difficult and judgment-laden"). Singled out as a factor meriting prime reliance was "local practice and custom." Other grain elevators in the area, the Commission emphasized, impose a charge similar to the one at issue:

> The record on remand establishes that these elevators, which compete for grain sales, are generally similarly constructed and provide the stevedoring companies the same measure of benefit and value as provided by Cargill's Baton Rouge facility. *Id.* at 27, J.A. 175.

Stating that it had considered the value of Cargill's service in connection with the benefits derived by stevedoring companies and the local custom and practice, the FMC held that § 17 presented no impediment to imposition of the ten cents per ton charge. *Id.*

Commissioner Kanuk dissented in part. In her view, the majority had not adequately articulated its reasons for departing from the approach the Commission took in 1975. She stressed that the record reveals no comparison of relative benefits accruing to vessels, stevedores, and other segments of the distribution chain, and she criticized the majority for placing undue reliance on stevedore charges at other elevators, without any evidentiary showing of similarity of costs and benefits. J.A. 179–83.

## II.

■ Section 17 of the Shipping Act, 46 U.S.C. § 816 (1976), requires those subject to FMC jurisdiction to establish, observe, and enforce "just and reasonable regulations and practices."[13] Our task is to determine whether the FMC has articulated a

---

**12.** A portion of the costs of the grain dock-wharf, the costs of a "spoutman" (who, at the direction of the stevedores' employees, raises and lowers spouts to the holds of the vessel, moves the spouts from hold to hold, and increases and decreases the flow of grain), and 10% of the salary of a Cargill employee who

engages in liaison activities between Cargill and the stevedores were all determined to be properly allocable to the stevedores.

**13.** The relevant portion of § 17 is set out in note 4 *supra*.

proper basis, supported by substantial evidence, for its ultimate conclusion that Cargill's charge was just and reasonable under § 17. *Transamerican Trailer Transport, Inc. v. FMC*, 492 F.2d 617, 630 (D.C.Cir. 1974). Close scrutiny of the FMC's decision is appropriate, in light of the Commission's departure from its previously stated position, 1975 Report, *supra*, 18 F.M.C. at 160–63—a position we upheld, *Cargill, Inc. v. FMC, supra*, 530 F.2d at 1069—that the charge was unreasonable because there was no showing that the shipping gallery and other facilities yielded benefits to stevedores equivalent to the benefits conferred upon vessels and shippers. *See Transamerican Trailer Transport, Inc. v. FMC, supra.* We conclude that the FMC has inadequately explained its current appraisal of the benefit to stevedores from the productivity increase provided by the automated shipping gallery. Absent a reasoned account by the Commission "consistent with law and supported by substantial evidence on the record," we cannot affirm the order on review. *See Baltimore and Annapolis R. R. v. Washington Metropolitan Area Transit Commission*, 642 F.2d 1365 at 1370–71, 1373 (D.C.Cir.1980) (obligation of agency to speak with precision and to supply a clear statement of reasons when it alters its course).

The Commission reasoned that stevedores benefit from the shipping gallery because their costs per ton loaded are reduced. In the Commission's words: "It is axiomatic . . . that if the costs per revenue producing unit of the stevedore are reduced, *all other factors being assumed constant*, its profit potential is greatly enhanced and a clear benefit is derived." [14]

All other factors, however, are seldom constant, and certainly were not constant in this case. When unit costs fall, a competitive market will usually cause unit prices to fall as well. Cargill's own expert, Phillip A. Linnekin, so acknowledged on cross-examination: "[A]s productivity goes up, normally in transportation ratemaking, assuming the same cost levels [here, hourly wages paid longshoreworkers], the rate would probably go down." J.A. 277. In light of this testimony and the normal behavior of competitive markets, the Commission might at least have considered the effect of automation on stevedore prices and profits. [15]

It is uncontroverted that stevedore rates and profits per ton dropped precipitously following the installation of the automated gallery. Of course, automation might be accompanied by a productivity increase sufficient to compensate for the decrease in profit per unit. But the record does not indicate this occurred. On the contrary, as Commissioner Kanuk observed, the FMC had before it "no indication from the record that increased efficiencies at [Cargill's] elevator have actually resulted in increased profits to the stevedore." J.A. 180, 182. What evidence there is suggests that the increase in productivity was more than offset by a sharp decline in per unit price and profit. [16] We agree with Commissioner Ka-

---

14. Brief for Federal Maritime Commission at 23 (emphasis added). The brief highlights the statement quoted in text as "the essential finding of the Commission." *Id.*

15. We agree with the Commission that a decline in profits for a given stevedore does not preclude Cargill from charging for the use of its services and facilities in reasonable relation to benefits derived therefrom. *See* Brief for Federal Maritime Commission at 24. However, there is no evidence that any stevedore's aggregate profit has increased due to increased tonnage handled. The general decline in stevedore profits suggested by expert testimony is a relevant factor the Commission should have addressed.

16. A Cargill executive stated that in 1955, it was projected that Cargill's Baton Rouge elevator would handle 18–19 million bushels of grain a year. Post-automation, he said, "the annual through put of export grain at the elevator has been as high as 130 million bushels." J.A. 213–14. (In fact, the record indicates that productivity has been as high as 152 million bushels. J.A. 107.) An officer of Cargill's wholly-owned stevedore subsidiary stated that stevedores charged approximately $5.00 per ton loaded pre-automation and eighteen cents per ton with the gallery in place. Their per ton profit margin dropped, he said, from approximately 75 cents per ton to slightly less than three cents per ton. *See* Joint Appendix at 194–96, *Cargill v. FMC, supra* (Docket Nos. 75–1018 and 75–1108).

nuk that the FMC majority has offered only a superficial analysis in support of its attribution of benefits to stevedores from the Cargill facility. That analysis, and the limited evidence on which it rests, do not supply a substantial foundation for the Commission's decision.[17]

■ Turning to the reasonableness of Cargill's charge, the Commission relied particularly on Cargill's argument that all Lower Mississippi River grain elevators assess a ten cents per ton services and facilities charge against stevedores. On this point we again agree with Commissioner Kanuk. Undue reliance was placed upon the argument.

First, we note that the Commission improperly considered an offer of proof relating to the practices of other elevator operators. The ALJ initially entertained some evidence relating to charges imposed by others. On second remand, however, he accepted no further evidence on the prevailing practice in the area, but he did permit Cargill to make an offer of proof in this regard. 1979 Report, *supra*, slip op. at 3 n.2, J.A. 151.[18] The Commission asserts that it accepted the proof offer "as evidence probative of the reasonableness of [the ten-cent] charge." Brief for Federal Maritime Commission at 3. This acceptance overlooked BARMA's right to subject the proffered evidence to adversary testing. An offer of proof serves two purposes. It allows a judge to give further consideration to the claim of admissibility, and it facilitates review of the first instance decision not to permit introduction of the evidence. McCormick on Evidence § 51 (2d ed. 1972). The Commission's treatment of the proffer as evidence denied BARMA the opportunity to cross-examine Cargill's witnesses. *See* 5 U.S.C. § 556(d) (Supp. III 1979) (a party to an adjudicative hearing is entitled "to conduct such cross-examination as may be required for a full and true disclosure of the facts"). Thus the Commission could not conclude that it had before it a full and fair airing of the matter addressed in the proof offer.

Second, as Commissioner Kanuk observed, separate slip op. at 4–5, J.A. 182–83, the record afforded the Commission scant basis for a comparison of Cargill's Baton Rouge operation with operations at other Lower Mississippi elevators.[19] For example, we note that only one of the several other elevators is regulated by the FMC to any degree.[20] What effect, if any, freedom from regulation has on the comparability of others' operations to Cargill's should have been addressed by the Commission.

Finally, the Commission's reliance on prevailing rates as a substitute for its own determination of reasonableness departs, without explanation, from the approach in-

---

**17.** Cargill asserted at oral argument that without automation, the elevator could not be competitive and would have to cease operations; thus, Cargill urged, the stevedores plainly benefit—automation enables them to stay in business in Baton Rouge. This argument did not figure in the FMC's presentation; the Commission's decision was anchored to the conclusion that the gallery, by reducing per ton loaded costs, necessarily and substantially operated to the financial benefit of stevedoring companies. As stated in the text at notes 15–16, we find that conclusion flawed.

**18.** Such a procedure is permitted under the Commission's rules, 46 C.F.R. § 502.152 (1979).

**19.** The Commission cites to a statement of an officer of Cargill's stevedore subsidiary and to admissions made by BARMA as evidence of similarity of the relevant grain elevators to Cargill's at Baton Rouge. Brief for Federal Maritime Commission at 20 n.10. *See* J.A. 323–29;

331–35. This evidence indicates the elevators on the Lower Mississippi differ in productivity; includes an averment by the officer of Cargill's stevedore subsidiary that, from his company's viewpoint, each of the nine grain elevators on the Mississippi River provides "approximately" the same services, facilities, and benefits in all respects but productivity; and shows that each elevator imposes a charge on stevedores for use of its services and facilities—at all but one the charge is ten cents per ton of grain loaded. Absent from the record is any evidence explaining why the sharp differences in productivity among the elevators are not reflected in their charges to stevedores; a comparison of costs for other elevators and for Cargill's Baton Rouge operation; and any detailed account of the similarity of benefits to stevedores.

**20.** *See* Brief for Federal Maritime Commission at 26.

dicated in *Volkswagenwerk v. FMC*, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). There, the Supreme Court held that the FMC may not sustain a charge against a § 17 attack merely because the challenger derives "some substantial benefit" from the party imposing the charge. *Id.* at 282, 88 S.Ct. at 940–41. Rather, "the correlation of that benefit to the charges imposed [must be] reasonable." *Id.* In particular, if the challenger pays more than other parties pay, for fewer benefits than other parties receive, then the charge is unreasonable under § 17. *Id.* at 281, 88 S.Ct. at 940.

As Commissioner Kanuk emphasized, the FMC "failed to conduct any comparative analysis of the relative benefits inuring to the several users of the facility." "This comparison," Commissioner Kanuk said, "was at the heart of the Commission's earlier approach and is essential to a determination that 'the charge levied is reasonably related to the service rendered.'" Separate slip op. at 4, J.A. 182 (quoting from *Volkswagenwerk, supra*, at 282, 88 S.Ct. at 940–41). We agree that, at this juncture, the Commission's order cannot stand given the absence of any "exposition of the relative benefits [of the automated gallery] to stevedores and other segments of the distribution channel." *Id.* at 2, J.A. 180.[21]

The Commission invoked and purportedly followed the *Volkswagenwerk* standard. 1979 Report, *supra*, slip op. at 16–18, J.A. 164–66. Arguably, that precedent need not dictate the course the FMC must take here.[22] But a break from comparative analysis of relative benefits would require a forthright and careful articulation by the FMC in support of a different approach.[23]

## III.

Because the Commission relied excessively on similar charges made at other grain elevators without refined analysis and, again without adequate explanation, undertook no comparative evaluation of relative benefits, we remand the matter once more. While we do not preclude the Commission from finding that Cargill's current charge, or any other charge, is reasonable under § 17, any such finding must be reasoned comprehensibly and supported by substantial evidence. Because the Commission, with this court's affirmance, has previously found the charge in question unreasonable, any future decision upholding the charge must clearly articulate the grounds for a change in position. The Commission may not ignore evidence concerning the impact of automation on stevedore prices and profits. If it adheres to the *Volkswagenwerk* standard, the Commission may not impose on stevedores a charge in sharp disproportion to costs allocated to others who may reap equal or greater benefit from the shipping gallery. Should the Commission seek support in prevailing practices at unregulated elevators, it must first determine from substantial evidence whether free market forces are operative, and provide an exposition of the similarities in costs and benefits between Cargill's elevator and those compared with it. After proceeding in this fashion, if the Commission again places principal reliance on local custom and

---

21. The Commission's analysis is all the more perplexing in light of its unexplained deviance from its own prior decision allocating the benefits of a shipping gallery equally between cargo and vessel. Rates and Practices of the Pacific Northwest Tidewater Elevators Ass'n, *supra*, 11 F.M.C. at 387.

22. *Volkswagenwerk* did not involve allocation of a charge among segments of a distribution channel (here the shipper, the stevedore, and the vessel); it concerned an allocation among competitors. Nor did *Volkswagenwerk* involve a charge alleged to draw support from practice and custom in the area.

23. Absent such explication by the FMC, we express no opinion on the merits of a departure from *Volkswagenwerk*. It is incumbent on an agency, when it shifts course, to "provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." *Columbia Broadcasting System, Inc. v. FCC*, 454 F.2d 1018, 1026 (D.C.Cir.1971). For recent elaboration, *see Baltimore and Annapolis R. R. v. Washington Metropolitan Area Transit Comm'n, supra*, 642 F.2d at 1370–71.

practice and thereby departs from the *Volkswagenwerk* comparative benefit standard, it must explain cogently why such a departure is justified under the statutory scheme and is consistent with the public interest.

The order reviewed herein is vacated, and the case is remanded to the Commission for further proceedings consistent with this opinion.

*Vacated and remanded.*